IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JANE DOE 1, *et al.*,           )
                                )
        Plaintiffs,             )
                                )
v.                              )        Case No. 2:04-cv-1155-WKW (WO)
                                )
AUTAUGA COUNTY BOARD OF         )
EDUCATION, *et al.*,            )
                                )
        Defendants.             )

## MEMORANDUM OPINION AND ORDER

This case is before the court on a Motion for Summary Judgment (Doc. # 94) filed by

defendants Autauga County Board of Education ("School Board"), Superintendent Joseph

L. Butler ("Butler"), and James Abraham ("Abraham").  For the reasons set forth below, the

defendants' summary judgment motion is due to be GRANTED in part and DENIED in part.

## I.  PROCEDURAL HISTORY

This litigation began with the plaintiffs' first complaint, which was filed on

November 11, 2004.  (Compl.)  The plaintiffs later filed a two-count amended complaint on

March 31, 2005.  (Am. Compl.)  Count One consists of a claim for sexual harassment under

Title IX against the School Board.  (*Id.* ¶¶ 13-22.)  Count Two consists of a Fourteenth

Amendment due process claim pursuant to 42 U.S.C. § 1983 against the School Board,

Butler, and Abraham.[1]  (*Id.* ¶¶ 23-30.)  The defendants filed a motion for summary judgment

---

[1] Prattville Elementary School was initially included but later dismissed as a party.  (Doc.
# 17.)

on June 26, 2006.  (Doc. # 95.)  The plaintiffs responded (Doc. # 99), and the defendants

replied.  (Doc. # 101.)

## II. FACTS

On October 20, 2004, three female fifth grade students at Prattville Intermediate

School told one of their teachers they had been touched by a substitute teacher, Mr. Terry

Wright[2] ("Wright"), and that it made them uncomfortable.  The teacher contacted the

principal of the school, Ms. Angel Garrett ("Garrett"), who then interviewed the three

students in her office.  The students told her that Wright was "brushing up against their hair

and face and touching them around their waist" and that his behavior made them feel

uncomfortable.  (Doc. # 100-8.)  Garrett apparently contacted the School Board's personnel

director immediately after talking with the students, although there is a significant

contradiction regarding the timing of this contact.[3]  The personnel director asked Garrett a

---

[2]  Wright, a retired Air Force Colonel, had cleared all required background checks by the Alabama Bureau of Investigation, the Federal Bureau of Investigation, and the Alabama Department of Human Resources.  (Butler Dep. 95:12-20; 121:4-6.)

[3]  In her deposition, Garrett contradicted herself regarding a critical timing issue.  In her contemporaneous letter to Butler, she claims to have called the School Board personnel director immediately after interviewing the students and before dismissing Wright.  (Doc. # 100-8.)  She also claims that the personnel director advised her what to tell Wright and why he was being dismissed.  (*Id.*)  However in her deposition, Garrett stated the opposite:

> Q:  Before you made the decision to tell him he would not be needed that day, did you call anyone or speak to anyone?
> A:  No.
> . . .
> Q:  [After Wright left, w]hat did you do at that point in time?
> A:  I contacted [the personnel director].
> Q:  And what did you tell her?

series of questions, including whether she thought the students were "a behavior problem," and whether she believed what the students said. (*Id.*) Garrett told her that she "felt something had happened that made them uncomfortable." (*Id.*) The personnel director then suggested that Garrett "simply let Mr. Wright know that his services were no longer needed" and that if he asked why, "to tell him we had made other arrangements." (*Id.*)

At the end of the school day, Garrett informed Wright that his services were no longer needed. He did not ask her why he was being removed and "simply smiled and walked away." (*Id.*) Parents soon began calling her "regarding the inappropriate behavior they felt he had displayed." (*Id.*) Garrett spoke to parents over the phone and in person, and repeatedly assured them that the situation "had been addressed" and "their child would not be placed in this type of situation again." (*Id.*) She refused to discuss Wright's character or personnel information, with the explanation that she "was not at liberty to discuss" these issues. (*Id.*) Despite Garrett's assurances, two parents told her they, along with other parents, intended to file a complaint with the police department. (*Id.*)

Two days after the incident occurred, Garrett memorialized the events and her

---

A: I told [the personnel director] that I had asked Mr. Wright to leave; that I no longer needed his services.
Q: And what did she say?
A: I believe she asked me why.
Q: Okay. And what did you say?
A: That he was ineffective at my school and that he made my students feel uncomfortable.

(Garrett Dep. 31:14-17, 23; 32:1-12.)

investigation in a letter written to Butler at his request.  (Doc. # 100-8.)   The letter was the only report or document of her investigation that she created.  (Garrett Dep. 39:23 - 40:3.) In the letter to Butler, Garrett describes the incidents of October 20 and also states that "I share your concerns regarding negative press publicity with this situation.  I hope that every attempt I made to resolve this problem over the last few days has not brought any negativity to Prattville Intermediate School or our school system."  (Doc. # 100-8.)

According to the defendants, Wright's name was removed from the substitute teacher list for the upcoming month because they determined him to be "an ineffective teacher." (Butler Dep. 50:6-14.)  In his deposition, Butler states the behavior exhibited by Wright on October 20 that he and Garrett considered ineffective was apparently not the uncomfortable touching, but rather that "he was trying to befriend the students to be able to control his class rather than manage his class."  (*Id.* 52:1-10.)  Upon making this determination, Butler had Wright's name removed from the upcoming monthly substitute list, which was then placed in each principal's box on October 25, 2004, bearing an effective date of November 1, 2004. (Butler Dep. 68:20-22, 132:3-10; Defs.' Br. 7.)   The new monthly substitute list was disseminated in the school district's normal manner.  (Butler Dep. 69:1-7.)

On October 25, 2004, Wright was used as a substitute teacher at Prattville High School.  One of the parents of a child who was touched on October 20 worked as a teacher at the high school.  (Garrett Dep. 40:17-22.)  Garrett knew of this connection and called the high school principal, who was a colleague of hers, to "let [him] know of [the parent's]

concerns." (*Id.*)  Garrett told the high school principal that Wright "appeared to be ineffective, and had made her children feel uncomfortable." (Stifflemire Dep. 31:16-20.) After receiving the call, the high school principal went to observe Wright through the classroom door.  He then returned to his office and sent a school resource officer, which is a type of security guard, to have Wright come to his office immediately while the resource officer remained with the class.  When Wright arrived, the high school principal "told him that we had the class covered for the remainder of the day, and that we would pay him his full salary for the day" and also that "we didn't need his services anymore that day." (*Id.* 36:6-11.)  Later that day, the high school principal called the personnel director to inform her that he sent Wright home.  Butler became aware of Wright's October 25 appearance in the school system, and his subsequent removal, on the day it happened.  (Butler Dep. 131:2-5.)

On October 29, 2004, a teacher at Prattville Elementary School became ill and needed to leave early.  Abraham, the principal, offered to help find a substitute teacher.  Using the October substitute list, Abraham called about twenty to twenty-five names to no avail before coming across Wright's name.  Wright was available and arrived at the school shortly after being called.  Later that afternoon, one of the students complained to the assistant principal that Wright had touched her.  Abraham was soon notified, and he began to question the students about what had happened.  The students described being touched on the chest and bottom. (Abraham Dep. 69:4-6.)  Abraham then had Wright report to his office and told him that there had been allegations of touching, that his services would no longer be needed, and

that he would have to report everything to his superiors and the police.  (*Id.* 75:6-13.) Abraham called the police that afternoon, at which point the police began an investigation of Wright, which led to criminal charges.  (*Id.* 89:2-6; Defs.' Br. 9.)

Two of the children touched by Wright on October 29 are plaintiffs to this suit.  Jane Doe 1 testified at her deposition that he touched her outside of her shirt on her arm, chest, and stomach.  (Doe 1 Dep. 61:19 - 65:22.)  Jane Doe 2 testified at her deposition that Wright touched her outside of her shirt on her arm and chest for several seconds.  (Doe 2 Dep. 64:8 - 66:8.)  Jane Doe 1 and 2  instituted this action by and through their mothers a little over a month later on November 30, 2004.  (Compl.)

### III.  JURISDICTION

Jurisdiction is proper under 28 U.S.C. § 1331 (federal question).  The parties do not contest personal jurisdiction or venue, and the court finds sufficient factual basis for each.

### IV.  STANDARD OF REVIEW

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

6

together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id*. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).   After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## V.  DISCUSSION

### A.      *Title IX*

Title IX states, in pertinent part, "[n]o person in the United States shall, on the basis

of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Under Title IX, "sexual harassment is discrimination in the school context." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999) (internal quotation marks omitted). There is "an implied private right of action for individuals to enforce the mandates of Title IX" and "private individuals can obtain monetary damages." *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1293 (11th Cir. 2007). A school district is not liable for damages under a Title IX implied right of action for the sexual harassment of a student by one of its teachers "unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998).

### 1.    School Official with Authority to Institute Corrective Measures

Neither the Supreme Court nor the Eleventh Circuit has provided definitive answers as to exactly what type of school official qualifies as an "appropriate person" having "authority to institute corrective measures on the district's behalf." *Id.*; *see also Hawkins v. Sarasota County Sch. Bd.*, 322 F.3d 1279, 1286-88 (11th Cir. 2003) (declining to decide whether notice to a teacher constitutes actual notice on the part of a school board and considering the question to be open); *Davis v. DeKalb County Sch. Dist.*, 233 F.3d 1367, 1372 n.6 (11th Cir. 2000) (leaving "for another day the task of delineating *Gebser's*

'appropriate person'"). The Eleventh Circuit has in the past, however, hinted toward a broad view that encompasses school officials beyond board members and superintendents: "[T]he Supreme Court did not hold that liability must be predicated upon actual notice to the school board or superintendent.   Rather, liability could attach upon notice to an 'appropriate person.'"  *Davis*, 233 F.3d at 1372 n.5 (quoting *Gebser*, 524 U.S. at 290).   Furthermore, while never actually deciding the issue, the Eleventh Circuit and at least one of its district courts has indicated a willingness to consider a principal an "appropriate person" in a Title IX private cause of action.  *See, e.g.*, *Davis*, 233 F.3d at 1372 (finding it unnecessary to decide whether a principal is an appropriate person, yet assuming *arguendo* that he could be such); *Hackett v. Fulton County Sch. Dist.*, 238 F. Supp. 2d 1330, 1349 (N.D. Ga. 2002) (same).

Regardless of whether a principal, such as Garrett, may be an "appropriate person" under the *Gebser* analysis, the question need not be answered here because, at a minimum, the superintendent of a school district is an appropriate person with authority to institute corrective measures on the district's behalf.  *Floyd v. Waiters*, 133 F.3d 786, 792 (11th Cir. 1998) (requiring superintendent or the board of education to have actual knowledge for Title IX liability in Georgia), *vacated*, 525 U.S. 802 (1998), *reinstated*, 171 F.3d 1264 (11th Cir. 1999); *A.G. ex rel. K.C. v. Autauga County Bd. of Educ.*, 506 F. Supp. 2d 927, 936-37 (M.D. Ala. 2007) (finding that the superintendent and the school board are appropriate persons under a Title IX analysis in Alabama).   The court's determination in *A.G.* is

9

especially persuasive in light of the fact that it arose out of the same set of facts as this case and the superintendent in question was Butler. *See A.G. ex rel. K.C.*, 506 F. Supp. 2d at 928, 937.

Therefore, Butler, as the School Board's superintendent, is an appropriate person having authority to institute corrective measures on the district's behalf to whom actual notice of sexual harassment, if given, may subject a school board to liability under Title IX.

## 2.     Actual Notice

"School districts are not liable for the misconduct of teachers under a theory of *respondeat superior* or constructive notice." *Hackett*, 238 F. Supp. 2d at 1346. The notice actually received must apprise an appropriate person with the school district "of the teacher's misconduct with [the student] or similar misconduct with other students." *Bailey v. Orange County Sch. Bd.*, 222 Fed. Appx. 932, 933 (11th Cir. 2007). The Eleventh Circuit has found "that a complaint of an incidental touching during an athletic event and a perceived imminent touching could not, as a matter of law, apprise Defendants to the *possibility* that [the teacher] was sexually molesting Plaintiffs." *Davis*, 233 F.3d at 1373 (emphasis added). A district court in the Eleventh Circuit has noted that "it is generally accepted that the knowledge must encompass either actual notice of the precise instance of abuse that gave rise to the case at hand or *actual knowledge of at least a significant risk of sexual abuse*." *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1348 (M.D. Ga. 2007) (emphasis added).

It is undisputed that both the intermediate elementary school principal and the

superintendent received actual notice of Wright's first incident of touching students on the day it occurred.  (Garrett Aff. 3; Butler Aff. 1.)  According to their affidavits, both of them also had actual knowledge of the details of the touching; namely that the substitute teacher "touched [the students'] hair, neck, back and/or side" and that this made the students feel "uncomfortable."  (Garrett Aff. 3; Butler Aff. 1.)  According to Butler, Garrett  "told [him] that she followed up with the parents of the students and was never notified that anyone felt that the touching by Mr. Wright was sexual."  (Butler Aff. 2.)  The defendants' entire argument that they did not receive actual notice hinges on their characterization of the first incident as non-sexual in nature.  (*See* Defs.' Br. 19.)

However, in a letter to Butler written two days after the first incident (Doc. # 100-8), which consisted of the only report of her investigation (Garrett Dep. 39:13 - 40:3), Garrett provides detail sufficient for a reasonable jury to find Butler received actual notice of a Title IX violation and that Wright posed a significant risk of future sexual abuse.  Despite Butler's assertion that he never received notice anyone felt Wright's touching was sexual (Butler Aff. 3), Garrett's letter to him states that more than one set of parents thought the behavior was so inappropriate that they planned to file a complaint with the police department.  (Doc. # 100-8.)  In addition, the touching is described as "brushing up against their hair and face and touching them around their waist"[4] and that at least one of the girls was touched on the "lower part" of her neck.  (*Id.*)  The touching was obviously alarming

---

[4] Garrett apparently omitted that there was also touching about the shoulder.  (Garrett Dep. 82:13-23, 83:1-2.)

enough that elementary school students could recognize that it was inappropriate and it frightened them enough that they told another teacher about it that very day.  When questioned about the veracity of the students' allegations of inappropriate touching, Garrett even admits in her letter that "I felt something had happened that made them uncomfortable." (*Id.*)

Furthermore, the actions taken by Garrett and Butler belie their characterization of Wright as merely an "ineffective teacher."  Upon learning that Wright was working as a substitute at the high school five days later, Garrett behaved in a curious manner for someone whose official investigation merely concluded Wright was an ineffective teacher and that his touching was non-sexual in nature.  She took the trouble of calling the high school principal, who was a former colleague of hers, to alert him that Wright was an "ineffective" substitute and had made her students feel uncomfortable.  (Stifflemire Dep. 31:16-20.)  Soon after receiving the phone call, the high school principal sent a school resource officer, who is essentially a type of security guard, to summon Wright to the front office.  (*Id.* 35:11-15.)  Even though the school day was not yet over, the principal ordered Wright to sign out and leave campus because his services were no longer necessary.  (*Id.* 36:6-11.)  These are drastic measures to take if one believes the defendants' purported conclusion that Wright was merely an ineffective teacher.

Based on the content of Garrett's letter, including the nature of the touching and the plan of some parents to involve the police, the underlying conversations referenced in the

12

letter, and the subsequent actions taken by the high school principal, a jury could reasonably believe there was more to the purported official conclusion of Wright's dangerousness than what Garrett and Butler's affidavits suggest. The court finds that, despite the school district's self-serving characterization of Wright as just an ineffective teacher who used friendship to manage his class, an appropriate person with the School Board received actual knowledge that Wright's presence in the school system at the very least posed a significant risk of sexual abuse to students.

### 3.   **Deliberate Indifference**

"[A] school district is not deliberately indifferent simply because the measures it takes are ultimately ineffective in stopping a teacher from harassing the plaintiffs." *Sauls v. Pierce County Sch. Dist.*, 399 F.3d 1279, 1285 (11th Cir. 2005). Rather, the "relevant inquiry" is "whether the school district's actions amounted to deliberate indifference." *Id.* In the similar context of student-on-student harassment, the Supreme Court has elaborated on the deliberate indifference standard, stating that it occurs "only where the [school district's] response to the harassment or lack thereof is clearly unreasonable *in light of the known circumstances*." *Davis*, 526 U.S. at 648 (1999) (emphasis added).

The defendants essentially argue that because Butler took some action after the first incidence of touching, such as removing Wright from the substitute list and requesting Garrett to make a written report, he was not deliberately indifferent. However, there is evidence that Butler deliberately muted his response in order to minimize negative publicity

13

for the School Board.

First, in her letter to Butler (Doc. # 100-8), Garrett's statement that "I share your concerns regarding negative press publicity with this situation," is evidence of a possible ulterior motive as to why Butler did not take more immediate action to prevent Wright from being employed as a substitute teacher again, but rather let him cycle off the monthly substitute teacher list in a more natural, and less noticeable, fashion.  Second, despite their repeated insistence that Wright was sent home after the first incident only because he was an "ineffective teacher" (*see, e.g.*, Butler Dep. 60:2-3, 6-7, 13-14; 61:4, 10; 62:9-10), nowhere do those words appear in the only written account of the investigation. (*See* Doc. # 100-8.) In fact, when given an opportunity to explain to Wright why he was being removed, Garrett describes receiving instructions from the School Board's personnel director to "simply let Mr. Wright know that his services are no longer needed" and, if he asked why, to tell him that "we had made other arrangements."  (Doc. # 100-8.)

In light of the known circumstances and drawing all justifiable inferences in the plaintiffs' favor, a genuine issue of material fact exists as to whether Butler acted with deliberate indifference.  Therefore, the defendants' motion for summary judgment is due to be denied as to the plaintiffs' Title IX claims.

**B.      *42 U.S.C. § 1983***

Count Two of the plaintiffs' amended complaint asserts a Fourteenth Amendment due

process claim[5] pursuant to 42 U.S.C. § 1983, alleging that the defendants "showed deliberate indifference to the abuse by failing to correct the problem and prevent Wright from continuing to act as a substitute teacher," which led to the harassment suffered by the plaintiffs. (Am. Compl. ¶¶ 26-27.) The § 1983 claims are analyzed below according to whether a defendant is sued in an official or individual capacity.

### 1.     School Board, Butler (Officially) and Abraham (Officially)

Because "[a] suit against a public official in his or her official capacity is simply another way of suing the public entity that the official represents," the court will address the claims against Butler and Abraham in their official capacities in conjunction with the claim against the School Board. *Hackett*, 238 F. Supp. 2d at 1358 n.9. In their amended complaint, the plaintiffs allege "[t]here was a clear pattern of sexual abuse," the defendants had "actual or constructive notice of Wright's propensity for sexual abuse," the defendants "showed deliberate indifference to the abuse by failing to correct the problem," and the defendants' "failure to act was the moving force behind the harassment." (Am. Compl. ¶¶ 24-27.) It is apparent that the plaintiffs are attempting to meet the rule as set forth in *Hackett*:

When a student is attempting to hold a school district liable under Section

_____

[5]  Although it is not clear from the Amended Complaint, the court presumes the plaintiffs' alleged constitutional violation is the Fourteenth Amendment right to bodily integrity as protected by substantive due process. *See, e.g., Hackett*, 238 F. Supp. 2d at 1353 (explaining that "[s]everal federal courts have recognized a 'liberty' interest by a student in his 'bodily integrity,' such that when a state actor, such as a public school teacher, violates that 'bodily integrity,' a claim under the Fourteenth Amendment arises"). The plaintiffs state in their response brief that Wright's conduct "would be deleterious to the constitutional rights of the plaintiffs' bodily integrity." (Pls.' Resp. Br. 14.)

1983 for sexual abuse by a teacher or other employee based on a custom or policy of a *failure* to act to prevent the sexual abuse, the plaintiff must establish: (1) the existence of a clear and persistent pattern of sexual abuse by school employees; (2) notice or constructive notice of the abuse to the school district or school board; (3) the school district's tacit approval of the conduct, or deliberate indifference from their failure to correct the problem; and (4) that the school district's failure to act was the "moving force" behind the violation of the plaintiff's constitutional rights.

*Hackett*, 238 F. Supp. 2d at 1365.

Assuming that the latter three requirements are satisfied, the plaintiffs fail to establish there was a clear and consistent pattern of sexual abuse. At the time Wright sexually abused the plaintiffs on October 29, there was only one previous instance that could possibly be considered sexual abuse. Indeed, the *Hackett* court noted that because only one teacher committed the acts of sexual abuse, "[t]here is no evidence that other teachers or employees had committed similar acts in the past so as to make it a persistent or widespread problem that was not being addressed." *Id.* Therefore, one prior instance of sexual abuse by the same teacher does not constitute a clear and consistent pattern arising to the level of constituting a custom or policy of a failure to act that can subject a school board to liability under § 1983.

## 2. **Butler (Individually) and Abraham (Individually)**

Although not specified in the Amended Complaint, the court assumes Butler and Abraham are also sued in their individual capacities. Butler and Abraham assume this as well and assert the affirmative defense of qualified immunity. "Qualified immunity shields governmental officials executing discretionary responsibilities from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which

16

a reasonable person would have known." *Williams*, 477 F.3d at 1300 (quoting *Courson v. McMillian*, 939 F.2d 1479, 1486 (11th Cir. 1991) (internal quotation marks omitted)).  The process for determining whether qualified immunity applies is as follows:  First, the government official bears a burden to "prove that he was acting within his discretionary authority."  *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003).  Second, if the government official meets his burden, it is then up to the plaintiffs to prove qualified immunity is not appropriate using a two-step analysis.  *Id.*  Step one of the analysis requires the consideration of this question: "[t]aken in the light most favorable to [the plaintiff], do the facts alleged show the officer's conduct violated a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the answer to step one is no, the plaintiffs have failed to meet their burden.  *See id.*  If the answer to step one is yes, the analysis proceeds to step two.  *See id.*  Step two requires the plaintiff to show the constitutional right "was clearly established . . . in light of the specific context of the case" and "not as a broad general proposition."  *Id.*

Because the plaintiffs do not contest that Butler and Abraham were acting within their discretionary authority and the court finds there is sufficient evidence they were, the burden shifts to the plaintiffs and the court will proceed with the two-step analysis to determine if qualified immunity is appropriate.  Step one requires the determination of whether the facts, taken in a light most favorable to the plaintiffs, establish a constitutional violation by Abraham and Butler.  The actual constitutional deprivations of the plaintiffs' right to bodily integrity were committed by a substitute teacher who worked as a subordinate to Abraham,

as principal, and Butler, as superintendent.  As a result, Abraham and Butler are supervisory officials.

Supervisory officials may still be liable, but "[t]he standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Braddy v. Fla. Dep't of Labor & Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998). Because "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates 'on the basis of respondeat superior or vicarious liability,'" *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (quoting *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)), plaintiffs must seek a more direct manner of holding supervisors liable.  Two types of supervisory liability exist in the Eleventh Circuit:  The first type is "when the supervisor personally participates in the alleged constitutional violation." *Hartley*, 193 F.3d at 1269 (quoting *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990) (internal quotation marks omitted)).   Because neither Butler nor Abraham personally participated in the violation of the bodily integrity of the plaintiffs, the first type of supervisory liability is inapplicable.

The second type is "when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown*, 906 F.2d at 671. This "causal connection" of the second type may itself be established in three different ways. The first way is "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Id.*  These

deprivations "must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Id.* The second way is "where the supervisor's improper 'custom or policy . . . result[s] in deliberate indifference to constitutional rights.'" *Hartley*, 193 F.3d at 1269 (quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991)). The third way is established by "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Gonzalez*, 325 F.3d at 1235 (citing *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1561 (11th Cir. 1993)); *see also West v. Tillman*, 496 F.3d 1321, 1328 (11th Cir. 2007).

Examining the first way, the plaintiffs do not argue there was a history of *widespread* abuse consisting of deprivations of a continued duration such that a causal connection could be made. Indeed, the appropriate focus of a qualified immunity analysis in the context of a § 1983 claim "is on the plaintiffs' actual constitutional deprivation," *A.G. ex rel. K.C.*, 506 F. Supp. 2d at 942, and here the plaintiffs' own deprivations were isolated to the incidents of October 29. Even if the October 20 incident is considered, at the time the plaintiffs suffered their constitutional deprivation, it was an isolated occurrence far from being "widespread." The plaintiffs fail to establish causal connection through a history of widespread abuse. The second way, through the identification of improper customs or policies that result in deliberate indifference, is also not established by the plaintiffs because they do not identify any customs or policies of Butler or Abraham with any degree of

specificity such that a causal connection could be made.

As for the third way, the plaintiffs do not allege either Butler or Abraham directed Wright to act unlawfully, nor is there any evidence whatsoever indicating such. Rather, the plaintiffs assert that Butler had "actual knowledge of the threat to the plaintiffs," and impliedly argue he should have taken "constructive steps to end the threat of molestation." (*See* Pls.' Resp. Br. 17.) Butler did fail to stop Wright from acting unlawfully. Butler's causal connection, if any, hinges on whether the plaintiffs have established facts that support an inference that Butler *knew* that Wright would act unlawfully.

In *Post*, where the third way of establishing causal connection seems to have originated in the Eleventh Circuit, the supervisors at issue were an elected city commissioner and a city official with the building and zoning department. *Post*, 7 F.3d at 1555. When a local restaurant supported an opposing candidate for city commissioner, the incumbent instigated a series of health and safety code investigations against the restaurant. *See id.* at 1555-56. As a result of the investigations, the restaurant owner was cited and arrested for violation of the building code, charged with interfering with an officer, and the restaurant manager was arrested for obstructing an officer and resisting arrest. *Id.* at 1555. The restaurant owner and manager filed claims under § 1983 alleging, among other things, retaliatory prosecution, false arrest, excessive force, and deprivation of due process. *Id.* at 1556. The plaintiffs presented evidence that one of the officials discussed plans to "hit" the restaurant to teach them a lesson and one of the inspectors called himself the city

commissioner's "hatchet man." *Id.* at 1561. Despite considering evidence that the city officials sent the inspectors to "hit" the restaurant in retaliation for supporting another candidate, and assuming the actions of the inspectors were unlawful, the Eleventh Circuit held these facts did not support the inference that the city officials "knew the code team would act unlawfully." *Id.*

If supervisors can send a team of subordinates with an outspoken mission to intimidate a political opponent and successfully deny knowledge that the subordinates would act unlawfully, it cannot be said a superintendent with no active role in steering a substitute teacher's action had knowledge the substitute would molest other students at a later date. The standard is not that he should have known the violation would occur. The standard is that he did know the violation would occur. In light of the "extremely rigorous" standard, the court concludes that the plaintiffs have failed to meet their burden of causal connection between the actions of Butler and the constitutional violation. Therefore, Butler is entitled to qualified immunity, and the defendants' motion for summary judgement as to the plaintiffs' claims against Butler in his individual capacity is due to be granted.

The plaintiffs' only allegations regarding Abraham's actual knowledge are lodged in the broad, collective language of their complaint against all of the defendants. (*See* Am. Compl. ¶ 25.) The plaintiffs' response brief ignores Abraham entirely and only targets Butler. Abraham has testified that he had no knowledge of Wright whatsoever prior to his appearance in his school the day of the October 29 incident and was unaware of any reason

not to use him as a substitute teacher.  (Abraham Dep. 36:6-10; 45:1-19.)   Abraham also

began an investigation upon his notification of the touching and called the police that same

afternoon.  (*Id.* 87:11-19.)   Abraham has presented evidence showing there is no causal

connection between his actions and Wright's unlawful behavior and the plaintiffs have failed

to rebut it.[6]   Therefore, Abraham is entitled to qualified immunity, and the defendants'

motion for summary judgement as to the plaintiffs' claims against Abraham in his individual

capacity is due to be granted.[7]

## VI.  CONCLUSION

For the reasons set forth above, it is hereby ORDERED that:

1.      The Defendants' Motion for Summary Judgment (Doc. # 94) is DENIED as

to the plaintiffs' Title IX claims; GRANTED as to the plaintiffs' § 1983 claim against the

School Board; and GRANTED as to the plaintiffs' § 1983 claims against Butler and

Abraham in their individual capacities.

DONE this 5th day of November, 2007.

             /s/  W.  Keith Watkins
        UNITED STATES DISTRICT JUDGE

---

[6]  Because the plaintiffs have failed to establish a causal connection for either Butler or
Abraham, there is no need to proceed with the step two analysis of whether the constitutional
right was clearly established.  *See Saucier*, 533 U.S. at 201.

[7]  The defendants additionally assert federal immunity through the "No Child Left
Behind" Act.  (Defs.' Br. 37.)  While the court is skeptical at best of this assertion, it is
unnecessary to address because Abraham and Butler enjoy qualified immunity.